# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

IN THE MATTER OF THE SEARCH OF
Two Thumb Drives CURRENTLY
LOCATED IN the APD evidence vault
identified as Property Tag: 1198642

Case No. 3:19-mj-0455-MMS

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION UNDER RULE 41 FOR A
## WARRANT TO SEARCH AND SEIZE

I, Ryan W. Borgeson, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of

Criminal Procedure for a search warrant authorizing the examination of the following:

    i.    APD Property Tag: 1198642, two Thumb Drives

This item is currently in possession of the Anchorage Police Department, and the extraction

of electronically stored information from these items is described in Attachment B.

2. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives

(ATF). Beginning in May 2018, I attended a 28-week ATF academy in Glynco, Georgia that

certified me as an ATF Special Agent. I have been assigned to the Anchorage Field Office since

December 2018. Since becoming a Special Agent with the ATF, I have participated in numerous

federal, state and local investigations involving firearm traffickers, armed narcotic traffickers,

felons in possession of firearms and ammunition and the use of firearms in furtherance of drug

Page **1** of **30**

trafficking crimes and other crimes of violence. Additionally I have a Bachelor's Degree in Criminal Justice from Sam Houston State University.

3. Through instruction and participation in firearm and narcotic related investigations, and through my conversations with other law enforcement officers, with whom I work, I know that:

> a) The distribution of controlled substances is an activity that continues over months and years. Persons involved in the trafficking of illegal controlled substances typically will obtain and distribute controlled substances on a regular basis, much as a distributor of a legal commodity would purchase stock for sale. Similarly, such drug traffickers will maintain an "inventory" which will fluctuate in size depending upon the demand for and the available supply of the product. I have learned through the experience of other law enforcement officers, that drug traffickers keep records of their illegal activities not only during the period of their drug trafficking violations but also for a period of time extending beyond the time during which the trafficker actually possesses/controls illegal controlled substances. The records are kept in order to maintain contact with criminal associates for future transactions and so that the trafficker can have records of prior transactions for which the trafficker might still be owed money or might owe someone else money. I have learned through the experience of other law enforcement officers, drug traffickers often have records of customers, as well as evidence of suppliers and co-conspirators, in one or more cellular telephones, either in the contact lists, sent or received calls, or text messages. These items are maintained in locations to which

OCT 0 7 2019

Page **2** of **30**

dealers of illegal controlled substances have ready access, such as within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities, such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

b) In *United States v. Terry*, F.2d 272 (9th Cir. 1990), *United States v. Angulo-Lopez*, 791 F.2d 1394,1399 (9th Cir.1986), *United States v. Hernandez-Escargega*, 886 F. 2d 1560, 1567 (9th Cir. 1989) and in *United States v. Fannin*, 817 F. 2d 1379, 1381-1382 (9th Cir. 1987), the court held that in the case of drug traffickers, evidence is likely to be found where dealers live and a search warrant may be properly issued against a suspected drug dealer's residence despite the lack of direct evidence of criminal activity at the residence. The court also held, in *United States v. Cardoza*, 769 F. 2d 625, 630 (9th Cir. 1985), that a search warrant may be properly issued to search a drug trafficker's storage locker despite lack of direct evidence linking the storage locker to criminal activity.

c) Individuals involved in the use, possession, manufacture, and/or trafficking of controlled substances commonly take measures insulate/distances themselves from their illicit activities, as well as the instruments used therein, to include premises, vehicles, firearms, and telephones. These measures include the use of real or fictitious nominees for transactions and activities which require the presentation of identification. Examples of these measures include: the use of premises rented,

OCT 07 2019

owned, or maintained by others (to include the use of others in opening utility accounts); the use of cellular telephones held in another's name; the use of others to ship and/or receive money and/or controlled substances; the use of others to purchase and/or store firearms, and the use of others to directly interact with the drug customers during the transactions. These measures also include the use of vehicles rented or owned by others, as well as the failure to transfer the title to newly purchased vehicles from the previous owner to the trafficker or even a nominee.

d) It is common for members of drug trafficking organizations to utilize fraudulent identification, in order to purchase airline tickets, send wire transfers, rent residences and storage facilities and subscribe for telephone/cellular telephone service. I have learned through the experience of other law enforcement officers that it is common for drug traffickers to keep fraudulent identification nearby and easily accessible to facilitate their flight upon the discovery of their illegal activities by law enforcement. All of these items are maintained in locations to which dealers of illegal controlled substances have ready access, such as within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities; such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

OCT 07 2019

Page **4** of **30**

e) It is common for members of drug trafficking organizations to possess scanners, security cameras and communications equipment (i.e. cellular telephones, fax machines and computers with Internet access) to protect and conceal their operation from law enforcement and other criminals and to monitor surveillance activities of law enforcement. Computer equipment is also used by members of drug trafficking organizations to store records related to drug trafficking and money laundering activities. All of these items are maintained in locations to which dealers of illegal controlled substances have ready access, such as within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities; such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

f) It is common for members of drug trafficking organizations, in an attempt to disguise their identities and illegal activities, to use pre-paid cellular telephones and pre-paid long distance calling cards. I know that often times the only way to connect a subject with a particular pre-paid cellular telephone or calling card is to seize the phone or calling card from the trafficker or his residence. The aforementioned items are maintained in locations to which dealers of illegal controlled substances have ready access, such as within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities; such

Page **5** of **30**

OCT 07 2019

as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

g) It is common for members of drug trafficking organizations to maintain telephonic communications before, during and after drug transactions. Calls and/or text messages are often made between the drug source of supply and the drug recipient, prior to departure of a drug courier and upon arrival of a drug courier at the destination. Once at the destination, it is common for the courier to contact the recipient, via the telephone. Records of such contacts, whether call logs or text messages, are frequently maintained in the cellular telephone's memory.

h) It is common for individuals involved in drug trafficking to use multiple cellular telephones to maintain contact with their associates. These individuals use multiple cellular telephones because cellular telephones are mobile and can be easily obtained with a different subscriber name. A different subscriber name and/or telephone number is often used by members of a drug trafficking organization to thwart law enforcement detection of their illicit drug trafficking activities. These different telephone numbers often have different subscriber names and/or are pre-paid cellular telephones where the subscriber is difficult to determine. Due to the fact that several different telephone numbers may be used, it is common for traffickers of controlled substances to maintain the names and

OCT 07 2019

Page **6** of **30**

telephone numbers of associates within the cellular telephone memory. These associate names and telephone numbers may be stored in historical call logs, text messaging history or within the contacts section of the cellular telephone.

i) It is common for members of drug trafficking organizations to take or cause to be taken, photographs and/or videos of themselves and their co-conspirators and associates. It is also common for members of drug trafficking organizations to take or cause to be taken, photographs and/or videos of themselves and/or their co-conspirators with controlled substances, large sums of money, guns and expensive assets (i.e. jewelry, luxury cars). The aforementioned images are frequently maintained in the memory of cellular telephone devices. Devices such as smart cellular telephones often imprint each photo with the GPS coordinates where such photos are taken. Thus, it is possible the location of stash houses and other evidence by analyzing a digital photo.

j) Certain cellular telephones have a feature which allow the subscriber or user of the device remote access to "wipe" or delete all the information if the device no longer in their possession whether it be because it is lost, stolen, or seized.

4. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## **IDENTIFICATION OF THE DEVICE TO BE EXAMINED**

5. This affidavit is being prepared in support of a search warrant of the following:

Page **7** of **30**

a) APD Property Tag: 1198642, two Thumb Drives

The listed item above is currently in possession of the Anchorage Police Department.

## Limited Nature of Affidavit

6. This electronic device is currently in possession of the Anchorage Police Department. This electronic device is suspected to contain evidence, instrumentalities, and fruits of violation of Title 21 U.S.C. §841(a)(1) and Title 18 U.S.C §924(c). I have participated in the investigation of the offenses set forth above. The facts and information contained in this affidavit are based upon my personal knowledge, information obtained from physical surveillance, federal search warrants, information obtained from federal, state and local law enforcement officers and information obtained from interviews and analysis of reports. In several instances, investigators received information from confidential informants (CI). This information is denoted as such in this affidavit and to the extent possible, has been corroborated through law enforcement or other secondary reliable sources. All observations referenced in this affidavit that were not made by me were related to me by the person who made such observations. Unless specifically indicated, all conversations and statements described in this affidavit are related in substance and in part only and are not intended to be a verbatim recitation of such statements.

7. I have not set forth each and every fact learned during the course of this investigation. I have set forth only those facts which establish the foundation for probable cause. Facts not set forth herein are not being relied upon to establish probable cause. Nor do I request that this

Page **8** of **30**

Court rely upon any facts not set forth herein in reviewing this affidavit in support of a search warrant the following electronic device:

    i. APD Property Tag: 1198642, two Thumb Drives

        1. The listed item above is currently in possession of the Anchorage Police Department.

8. Further, through instruction, training, and participation in investigations, as well as through consultation with other agents and law enforcement personnel, I have become familiar with the manner in which armed narcotics traffickers conduct their illegal business and the methods used to disguise their narcotics activities. From experience and training, I have also learned that narcotics traffickers frequently use encrypted cellular telephone applications, cellular phone services, and other technologies to communicate, conduct, and conceal their illegal activities from law enforcement.

9. Based on the facts as set forth in this affidavit, there is probable cause to believe that the information described in Attachment A contains evidence of violations of Title 21 U.S.C. §841(a)(1) possession of a controlled substance with intent to distribute and 18 U.S.C. §924(c) possessing a firearm in furtherance of drug trafficking, as described in Attachment B.

OCT 07 2019

## **PROBABLE CAUSE**

**APD Case 18-10269**

## *March 11, 2018, Misconduct Involving Controlled Substance (MICS)*

10. March 11, 2018, Anchorage Police Department (APD) Officer Degnan was dispatched to a disturbance at 7558 Foxridge Way #6F, Anchorage, AK 99518. PANGILINAN was arrested on Municipal Conditions. During the search Officer Degnan found a small clear baggie with 1.15 grams of a white crystal substance in PANGILINAN's pocket. The substance field-tested positive for methamphetamine. PANGILINAN stated during a post-Miranda interview that the substance was methamphetamine and that he recently started using again.

### APD Case 18-51612 and 18-51793
#### *December 26, 2018, Eluding and MICS*

11. December 26, 2018, APD was pursuing a lead of a tracked stolen Subaru Outback bearing AK Plate: JKN560. The vehicle was located at 8101 Peck, Anchorage, Alaska, still running, and the driver sleeping in the driver seat, as the sole occupant. APD removed the driver (identified as PANGILINAN) from the vehicle without incident. Officer Rydberg observed two cell phones (**APD Tags: 1177969 and 1177970**) in the vehicle, one of which was receiving a text message.

OCT 07 2019

12. According to Officer Rydberg, the message displayed on the phone was consistent with an illicit drug customer requesting $250 worth of an illicit substance from their drug supplier. Officer Rydberg based this opinion on his training and experience, as well as his tenure with APD's Vice Unit. PANGILINAN was searched and a small baggy with a white crystalline substance was removed from his left jacket pocket. The crystalline substance weighed 1.01 grams and field-tested positive for methamphetamine.

Page **10** of **30**

## APD Case 19-5404

### *February 10, 2019, Misconduct Involving Controlled Substance (MICS)*

13. February 10, 2019, APD Officer See conducted a traffic stop on a vehicle whose occupant(s) gave information to Officer See. Officer See was informed that PANGILINAN had multiple warrants and was dealing narcotics. PANGILINAN was currently supplying "Isaac" who works security at Barrett Inn Hotel (Address: 4610 Spenard Rd, Anchorage, AK 99517).

## APD Case 19-7231

### *February 24, 2019, MICS, Assault, Eluding, Resisting Arrest, Tampering with evidence*

14. February 24, 2019, APD responded to a shots fired call at the Mt. View Car Wash (Address: 3433 Commercial Dr, Anchorage, Alaska). When officers arrived a green/black Honda Civic bearing AK Plate: JKX415 was attempting to flee the location. Officer Frey attempted to block the Civic which resulted in the Civic ramming the patrol car. The driver of the vehicle (identified as PANGLILNAN) fled the vehicle along with passengers Hans WELLS and Shania AGLI. A pistol was observed on the driver's seat of the vehicle with an extended magazine.

15. PANGILINAN pulled an iPhone (**APD Tag: 1181490**) and other items out of his pockets, dropping them on the ground. PANGILINAN continued to refuse commands and was ultimately tased to gain compliance. Officers located a baggy containing .81 grams of a white crystal substance that tested positive for methamphetamine near the iPhone, where PANGILINAN was dropping items on the ground.

 OCT 07 2019

Page **11** of **30**

16. During a post-Miranda interview, AGLI stated that she received a phone call from PANGILINAN where she heard gunshots in the background. AGLI arrived at the Mt. View Car Wash and observed PANGILINAN upset and he shot a round into the center console of the vehicle. While speaking with PANGILINAN, AGLI heard sirens in the distance. PANGILINAN then attempted to take another vehicle, trying to flee the scene.

## APD Case 19-19061

### *May 31, 2019, Assault on Peace Officer*

17. May 31, 2019, APD Officer Richwine performed a traffic stop on a black GMC Yukon/Denali bearing AK Plate: EAA659 at the 227 block of Newell Street, Anchorage, AK. As Officer Richwine contacted the driver of the vehicle, Officer Richwine observed spent cartridge cases on the front and rear passenger floorboards, numerous loose pieces of ammunition throughout the vehicle, along with a loaded Glock 21 pistol with an extended magazine tucked behind the driver seat near the center console. Officer Richwine secured the Glock 21 pistol and began asking the driver and passenger questions. The driver of the vehicle was identified as PANGILINAN.

18. While Officer Richwine began to research PANGILINAN through his mobile computer in his patrol vehicle, a white Kia sedan or white Ford Fusion with tinted windows drove by the traffic stop, shooting. Officer Richwine began to exit his vehicle, and as he was doing so, the GMC Yukon/Denali bearing AK Plate: EAA659 began to drive in reverse toward Officer Richwine's patrol car. The GMC Yukon/Denali rammed the patrol car and the open driver door

Page **12** of **30**



OCT 0 7 2019

struck Officer Richwine in the chest, knocking him off his feet, and causing him pain. The GMC Yukon/Denali pulled forward and backed into the patrol car again to gain space, attempting to flee. The GMC Yukon/Denali eluded police, driving through fences and yards. The GMC Yukon/Denali and white Kia/Ford Fusion successfully elude apprehension.

## APD Case 19-19615

### *June 4, 2019, Threat*

19. June, 4, 2019, APD Officer Masten was investigating a drive by shooting threat at 1037 Fred Circle, Anchorage, AK 99515. Officer Masten interviewed the neighbors of 1037 Fred Circle who confirmed that two previous shooting occurred at 1037 Fred Circle on June 3, 2019 and June 4, 2019 (APD Reports 19-19404 and 19-19552). Officer Masten interviewed the occupant/victim of 1037 Fred Circle who stated that she received a text message from her husband naming PANGILINAN as one of the four suspects of the reported shootings.

20. Officer Masten contacted the Anchorage Pretrial Office and was informed that PANGILINAN was a methamphetamine dealer. PANGILINAN had cut off his ankle monitor on May 20, 2019 and pretrial retrieved the property on May 21, 2019 and found a meth pipe along with an empty holster were located at PANGILINAN's residence 327 Pauline St #B, Anchorage, AK 99504.

## APD Case 19-19902

### *June 6, 2019, Eluding, MIW/Driveby Shooting*



OCT 07 2019

21. June 6, 2019, APD was actively looking for a 2001 black GMC Yukon/Denali bearing AK Plate: EAA659 for being in multiple crimes. The GMC Yukon/Denali was located at 3021 Lois Drive, Anchorage, Alaska unoccupied. A gold GMC Sierra bearing AK Plate: JDA631 dropped off a Polynesian male who got into the driver's seat of the black GMC Yukon/Denali. Officer Lewis attempted to stop the GMC Yukon/Denali. The driver failed to stop and Officer Lewis unsuccessfully attempted to pin the GMC Yukon/Denali. An occupant of the gold GMC Sierra began firing multiple rounds while Officer Lewis attempted to stop the GMC Yukon/Denali.

22. The GMC Yukon/Denali was located near 833 N Bunn, Anchorage, Alaska, and the GMC Sierra was located at 3324 Thompson, Anchorage, Alaska, both vehicles unoccupied. The vehicles were seized pending search warrant and taken to APD Indoor Secured Storage.

23. June 11, 2019, APD applied for and was granted search warrants 19-1898SW (gold GMC Sierra bearing AK Plate: JDA631) and 19-1900SW (black GMC Yukon/Denali bearing AK Plate: EAA659).

24. June 12, 2019, APD served search warrants 19-1898SW and 19-1900SW. Fingerprints and DNA were taken from both vehicles. June 18, 2019, the fingerprint specimen from the gold GMC Sierra's driver's exterior door was positively identified as belonging to PANGILINAN.

25. During the course of this investigation, I have learned that PANGILINAN and his co-conspirators travel in tandem vehicles. If one of the vehicles is stopped by law enforcement, the other vehicle will provide a distraction, such as shooting in the officer's direction, so the other vehicle can elude law enforcement.



OCT 0 7 2019

## APD Case 19-24229

### *July 9, 2019, MICS and Eluding*

26. On July 9, 2019, APD conducted surveillance at 327 Pauline, Anchorage, Alaska for an active State of Alaska arrest warrant for PANGILINAN. PANGILINAN left 327 Pauline and got into the right rear passenger seat of a red Suburban bearing AK Plate: EEJ941. The driver of the vehicle was observed and identified as Hans WELLS. WELLS also had outstanding warrants for his arrest. APD followed the red suburban to the Holiday Gas Station at 1405 Bragaw, Anchorage, Alaska where they attempted to stop the vehicle. The Suburban eluded.

27. APD officers located the red Suburban, abandoned, in an empty parking lot at the intersection of Fireweed Lane and Seward Highway, Anchorage, Alaska. APD officers observed PANGILINAN enter 606 E Fireweed Lane, Anchorage, Alaska at approximately 1745 hours, via Sorrento's Restaurant (Address: 610 E Fireweed Lane, Anchorage, Alaska) surveillance camera footage. At approximately 1901 hours, PANGILINAN departed 606 E Fireweed Lane and got into an unknown white Chevrolet Tahoe.

28. At approximately 2215 hours, PANGILINAN was observed leaving 3240 Penland Parkway #88, Anchorage, Alaska in the front passenger seat of a red Honda CRV, bearing AK Plate: JMM930. APD officers observed WELLS leave 3240 Penland Parkway #88 and walk east towards Burger King (Address: 700 Northway Dr, Anchorage, Alaska). Officers observe WELLS approach a 2014 white Cadillac Escalade (AK Temporary Tag: T816535) where PANGILINAN was standing near the driver's side door.

Page **15** of **30**

OCT 0 7 2019

29. At approximately 2225 hours, APD officers approached the vehicle to arrest PANGILINAN. PANGILINAN attempted to flee the area. APD Officer Butler observed PANGILINAN discard items as he fled the area. PANGILINAN climbed a fence on the west side of the Burger King parking lot and continued to discard items, to include a white iPhone with a Under Armour case and sim card **(APD Property Tag: 1198846)**. APD officers eventually contacted PANGILIAN and he was arrested for his outstanding State of Alaska arrest warrant.

30. Through his prior training and experience, APD Officer Butler identified some of the discarded items as suspected methamphetamine. APD Officer Keating collected and took custody of the suspected methamphetamine and the white iPhone. The substance field-tested positive for methamphetamine. The methamphetamine was weighed at APD and had a gross weight of 166 grams (including packaging). Additionally, officers observed and captured a photo of the locked screen of the white iPhone in which there were several missed calls and Facebook messages from known associates of PANGILINAN.

OCT 07 2019



31. APD applied for and was granted search warrant 3AN-19-2225SW for the detached

storage shed in the back yard of 327 Pauline #B, which PANGILINAN had sole access to.

Officers observed a sophisticated security system within the shed which covered all avenues of

Page **17** of **30**

OCT 0 7 2019

approach along with a safe, firearm magazines, ammunition, a digital scale, and other items. The following items were seized from the shed:

a) **APD Tag: 1198643**-Swann DVR
b) **APD Tag: 1198644**-Samsung DVR
c) **APD Tag: 1198645**-Night Owl DVR
d) **APD Tag: 1198647**-Digital scale
e) **APD Tag: 1199219**-Safe

32. APD Officer Butler breached the safe and seized the following content within the safe:

a) **APD Tag: 1198641**-Drug scale from safe, with drug residue
b) **APD Tag: 1198642**-Two Thumb Drives from safe

33. On July 10, 2019 (the day after PANGILIAN was arrested after fleeing officers), ATF Task Force Officer (TFO) Adair contacted occupants at 3240 Penland #88, Anchorage, AK where PANGILIAN was observed the previous day. Veronica ZITTNAN was arrested for outstanding warrants after she attempted to flee the residence. ATF TFO Adair spoke with occupants of the residence, who stated PANGILIAN discarded multiple firearms at the home after initially fleeing officers on the 9th. ATF TFO Adair suspected evidence of this information might be contained within the cellular telephone PANGILIAN attempted to discard before being arrested.

## ATF Case 787010-19-0069

### *Continued investigation*

34. Based upon my training and experience, the amount of methamphetamine possessed by PANGILIAN on July 9, 2019 is consistent with the intent to distribute. Although no firearms

Page **18** of **30**

OCT 07 2019

Case 3:19-mj-00455-MMS   Document 1-1   Filed 10/07/19   Page 18 of 30

were located on his person at the time of arrest, it is common for individuals engaged in mid-level drug transactions to possess firearms to protect themselves and their business endeavor. This common possession of firearms is also apparent in the aforementioned cases. I suspect evidence of his involvement with firearms, in relation to the distribution of controlled substances, will also be located within the two Thumb Drives (**APD Tag: 1198642**) sought in this affidavit.

35. August 7, 2019, at approximately 1330 hours, APD Cyber Crimes Technician Brandon Hunter executed search warrant 3:19-mj-291-DMS for PANGILINAN's phone (**APD Tag: 1198846**). The security encryption could not be bypassed. From the partial extraction, ATF SA Ryan Borgeson was able to locate an iCloud account linked to the phone: team_g907@icloud.com.

36. On October 2, 2019, ATF SA Borgeson reviewed jail phone calls made by PANGILINAN, July 10, 2019 through August 1, 2019 and September , while incarcerated in Anchorage Jail (Address: 1400 E 4th Ave, Anchorage, Alaska). A review of these jail calls identified the following pertinent conversations made from PANGILINAN's account:

*July 22, 2019 at 1632 Hours - Phone call to phone number 907-957-0944*

a) At approximately 4 minutes and 55 seconds Shania asks PANGILINAN "Why you keep telling me you fucked over my cousin Mathew nigga?" "Why do you

Page **19** of **30**

OCT 0 7 2019

Case 3:19-mj-00455-MMS   Document 1-1   Filed 10/07/19   Page 19 of 30

keep telling me you got my cousin for 800?". PANGILINAN replies with "cause he didn't send my fucking last bill, he owe me like 1800 the last trip".

b) At approximately 8 minutes Shania states "I know I should have got you for that ah eight (8) grand last time" "the eight, eight, eight racks last time". PANGILINAN responds with "oh oh ya in the bag?". Shania responds with "eight grand in fifteen minutes nigga".

c) At approximately 10 minutes and 10 seconds PANGILINAN states "he admitted to Anchorage Police that he drives me around town to sell drugs" "I don't know but, I forgive him".

d) At approximately 14 minutes Shania asks PANGILINAN if he ever found anything out about his Kia. Shania wonders if APD still has it and what is going on with it, referencing that something of significance was located in the vehicle.

e) During the course of the investigation, I have learned that PANGILINAN and his co-conspirators have engaged in numerous crimes involving firearms and controlled substances. I suspect evidence of his involvement with firearms, in relation to the distribution of controlled substances, will be located within the Kia.

*July 23, 2019 at 2013 Hours - Phone call to phone number 907-957-0944*



OCT 07 2019

Page **20** of **30**

f) At approximately 4 minutes into the conversation, PANGILINAN states "Tell Mika I'm over here ah, I'm on Golf Mod" "the side of the jail where the trailer is where he could just pishhh pishhh pishhh" If they know where I am at technically they could get me out of here" "cause the gate is right there, and its only grass" "only fucking a wall." "I think one Hummer." "I'm going to make a plan and send it to you".

*July 31, 2019 at 1651 Hours – Phone call to phone number 907-312-0386*

g) At approximately 1 minute and 10 seconds into the conversation PANGILINAN states "I left something in there… the cabinet where the dart board is" "there's a gat there… my gun, just look you'll see it".

*September 26, 2019 at 2031 Hours – Phone call to phone number 907-744-8071*

35. At approximately 15 minutes and 30 seconds PANGILINAN states "I'm going to do my time, I'm going to finish it… then I'm back at it again."

## TECHNICAL TERMS

36. Based on my training, and experience, I know cellular telephones and other electronic devices often have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, PDA, and to access the Internet. In my training

Page **21** of **30**

OCT 0 7 2019

and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

37. Based on my training and experience, I use the above technical terms to convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a

Page **22** of **30**



OCT 0 7 2019

variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated

OCT 0 7 2019

"GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. Computer: a computer as used herein is defined in 18 U.S.C. § 1030(e)(1), and includes an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.

f. Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

Page **24** of **30**



OCT 0 7 2019

g.  PDA: A personal digital assistant, or PDA, is a handheld electronic device used
    for storing data (such as names, addresses, appointments or notes) and utilizing
    computer programs. Some PDAs also function as wireless communication
    devices and are used to access the Internet and send and receive e-mail. PDAs
    usually include a memory card or other removable storage media for storing data
    and a keyboard and/or touch screen for entering data. Removable storage media
    include various types of flash memory cards or miniature hard drives. This
    removable storage media can store any digital data. Most PDAs run computer
    software, giving them many of the same capabilities as personal computers. For
    example, PDA users can work with word-processing documents, spreadsheets,
    and presentations. PDAs may also include global positioning system ("GPS")
    technology for determining the location of the device.

h.  Internet: The Internet is a global network of computers and other electronic
    devices that communicate with each other. Due to the structure of the Internet,
    connections between devices on the Internet often cross state and international
    borders, even when the devices communicating with each other are in the same
    state.

i.  IP Address: An Internet Protocol address (or simply "IP address") is a unique
    numeric address used by computers on the Internet. An IP address is a series of
    four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).
    Every computer attached to the Internet computer must be assigned an IP address

Page **25** of **30**

OCT 0 7 2019

so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

38. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

39. There is probable cause to believe that things that were once stored on the Device may still be stored there, for at least the following reasons:

a) Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

Page **26** of **30**



OCT 0 7 2019

b) Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c) Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d) Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

40. *Forensic evidence.* As further described in Attachment A, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

Page **27** of **30**

OCT 0 7 2019

a) Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b) Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c) A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d) The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e) Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.



OCT 0 7 2019

41. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

42. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

Page **29** of **30**

OCT 0 7 2019

## CONCLUSION

43. Based upon the foregoing, your affiant submits this affidavit as probable cause to believe

    Gian PANGILINAN is in violation of Title 21 U.S.C. §841(a)(1) possession of a controlled

    substance with intent to distribute and 18 U.S.C. §924(c) possessing a firearm in furtherance

    of drug trafficking is requesting a search warrant be granted authorizing the examination of

    the Devices identified as the following:

    i) APD Property Tag: 1198642, two Thumb Drives

    to seek the items described in Attachment B.

Respectfully submitted,

Ryan W. Borgeson
Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives

Subscribed and sworn to before me
on October 7, 2019:

UNITED STATES MAGISTRATE JUDGE



OCT 0 7 2019